ADAMS, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| S.H.A.R.K., *et al.*, | ) | |
| | ) | CASE NO. 5:04CV2329 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge John R. Adams |
| | ) | |
| METRO PARKS SERVING SUMMIT | ) | MEMORANDUM OPINION & ORDER |
| COUNTY, *et al.*, | ) | [Resolving Docs. 50, 52, & 53] |
| | ) | |
| Defendant. | ) | |

## I. Introduction

This matter is before the Court on three motions for summary judgment the Defendants to this action filed. Defendant Metro Parks, Serving Summit County filed the first motion. Defendants David Rankin and Justin Simon filed the second motion. And Defendants Anthony DeNicola and White Buffalo, Inc. filed the third motion. All three motions were opposed by Plaintiffs Showing Animals Respect and Kindness ("S.H.A.R.K.") and Steve Hindi. The Court has been advised, having reviewed the parties' pleadings; motions, oppositions, and replies thereto; attached exhibits; and applicable law. For the reasons set forth herein, the Court grants all three motions.

## II. Statement of Facts & Procedure

Hindi is the founder and president of S.H.A.R.K., which is a not-for-profit corporation that works to expose governmental and private organizations that treat animals inhumanely (collectively "Plaintiffs"). Metro Parks, Serving Summit County ("Metro Parks") is a governmental entity that operates public parklands. Rankin and Simon are full-time Metro Parks employees who serve as park rangers. DeNicola is the president of White Buffalo, Inc. an

organization that provides a service known as "deer culling" in which deer are killed through sharpshooting methods (collectively "White Buffalo").

In November 2003, Metro Parks hired White Buffalo to cull deer during the winter season. White Buffalo was to train the park's rangers to cull the deer and it was also to participate in the culling process. Although the culling was to take place in public areas of the park, it was scheduled to take place during the evenings when those areas of the park were closed to the public.

In February 2004, Plaintiffs entered the parks during daytime hours and planted nine cameras to film the culling. They placed the cameras in areas that they "believed" to be bait sites. The cameras were placed in bags on the ground and covered by leaves. A wire was run up the trees and a small camera lens was attached to tree bark with a small screw or bracket. The cameras were pre-programmed to operate at set hours. Some of the cameras were placed in public areas and some of them were found in areas that were impliedly off-limits to the public.

Plaintiffs' intent was to film the entire two-week culling and then share the video with the news media. Most of the cameras were discovered at some point during the culling. The cameras that were recovered were taken back to the ranger station and placed in the evidence locker. They were considered "found property" and not "evidence." Plaintiffs, however, were able to capture the video that was recorded because Hindi would go to each camera location daily and change out the camera's digital imaging unit to obtain images from the previous night.

Plaintiffs filed their Complaint on November 23, 2004. They filed an Amended Complaint on February 23, 2005. Plaintiffs bring two federal claims. Their first claim is brought under Section 1983 and seeks redress for an alleged violation of Plaintiffs' First Amendment rights. The second claim seeks redress for an alleged violation of the Privacy Protection Act, 42 U.S.C. § 2000aa. Plaintiffs also allege state-law claims for destruction of

2

property, conversion, and for a violation of Section 2307.61 of the Ohio Revised Code.

### III.  Legal Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The court is to determine "whether there is the need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Importantly, the court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmoving party.  *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).

Summary judgment is appropriate if the party that bears the burden of proof at trial does not establish an essential element of its case. *Tolton v. Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247-48 (emphasis in original).  In order for there to be a genuine issue for trial, there must be sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  *Id.* at 249.  Having discussed the Rule 56 standard of review, the Court now turns to the merits of Defendants' motions.

### IV.  Law & Analysis

**A.     Plaintiffs' Federal Claims**

**1.     Plaintiffs' First Amendment Claim**

According to Defendants, summary judgment is appropriate on Plaintiffs' First

3

Amendment claim for a variety of reasons, but primarily because Plaintiffs have not suffered a First Amendment violation.  Plaintiffs, on the other hand, argue that they have suffered a constitutional violation.  Although they admit that this is a case of first impression, Plaintiffs argue that the thrust of their claims is that they had a constitutional right to place the cameras in the parks and that Defendants, by seizing and destroying the equipment, infringed on their First Amendment rights.

Both parties agree that the standard by which the Court must evaluate Plaintiffs claim is set forth in *Parks v. City of Columbus*, 295 F.3d 643 (6th Cir. 2005).  In *Parks*, the Sixth Circuit set forth the proper analysis for First Amendment claims as follows: (1) the court must determine whether the speech is protected under the First Amendment; (2) the court must then determine the nature of the forum; and, lastly, (3) the court must determine whether the reasons for prohibiting speech satisfy the appropriate standard of review.  *Id.* (citing *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)).  Plaintiffs claim that they meet all three prongs of this test and that summary judgment is not proper.  The Court, however, disagrees.

Having read Plaintiffs' briefing and the case law to which they cite, the Court is not persuaded that they were either engaged in "speech" protected by the First Amendment or that they had a constitutional right to place the cameras in the parks.  First, as Plaintiffs concede, the media has no greater right to access information beyond that which is afforded to the general public.  *Pell v. Procunier*, 417 U.S. 817, 834 (1974).  In fact, the Supreme Court has stated that the government has no "affirmative duty to make available to journalists sources of information not available to members of the public generally."  *Id.*  To support their claims, Plaintiffs cite to *Houchins v. KQED, Inc.*, 438 U.S. 843, 847 (1978) for the proposition that they have the right to gather news from any source by means within the law.  Plaintiffs, however, overlook the fact that

4

*Houchins* clearly states that there is no unfettered right of access to newsworthy information. *Id.* (stating that a claimed "special privilege of access" is not a right that is essential to guarantee the freedom to communicate or publish information).

Here, Plaintiffs claim that their placing of cameras in the parks was their attempt to gather news and that it was within the law for them to do so. The logic behind Plaintiffs' theory is that because no criminal charges were filed against them, the means they chose to obtain the information was "within the law" and that they had a right to gather information in the locations they chose and by whatever means they chose. Both the park and the deer culling, however, were not open to the public at the time the cameras were scheduled to operate.

In an attempt to justify their placement of the cameras in the parks, Plaintiffs cite to *Tucker v. City of Fairfield*, 398 F.3d 457, 461 (6th Cir. 2005). In *Tucker*, the Sixth Circuit held that the use of a portable rat balloon on a public right of way as part of a demonstration against unfair labor practices was deserving of First Amendment protections because the balloon was not permanent and was easily moveable. *Id.* Attempting to analogize the facts of their case to those in *Tucker*, Plaintiffs claim that their cameras were also not permanent and easily moveable and they attempt to defeat Defendants' arguments that the cameras could have possibly damaged foliage. The Court, however, finds Plaintiffs reliance on *Tucker* misplaced. In *Tucker,* the rat balloon conveyed an expressive message. Here, the cameras themselves convey no expressive message. Thus, *Tucker* is inapplicable. The real issue, as the Court views it, is not whether Plaintiffs were denied their First Amendment right to freedom of speech. Rather, the issue is one of denial of access to information.

By way of comparison, the Court finds instructive *D'Amario v. Providence Civic Center*

*Auth.*, 639 F.Supp. 1538 (D.R.I. 1986).[1] In *D'Amario*, the plaintiff was a freelance commercial photojournalist who sought to photograph certain performances at the Providence Civic Center. According to the plaintiff, the defendants "no camera" rule violated his right to free speech because he was prohibited from taking pictures of the performance. *Id.* at 1539. In analyzing his First Amendment claims, the district court found that the plaintiff's First Amendment right to freedom of speech was not directly implicated. *Id.* at 1541. According to the court, "the activity in which [the plaintiff sought] to engage does not partake of the attributes of expression; it is conduct pure and simple. [It was] not a case where the plaintiff desire[d] to 'express' himself by displaying the existing fruits of his photographic endeavors. . . ." *Id.* The court noted that the case was one in which the plaintiff desired to "do" something, i.e. to enter the center and photograph the performers. *Id.* According to the court:

> [T]he issue . . . is not whether the plaintiff may be restricted from communicating or displaying information he has already garnered. His problem is precisely the opposite: he has come away empty-handed, having been denied license to let his camera rove at will. Seen in its true perspective, the issue is whether a photographer (or photojournalist) may have special rights of access to "information" . . . .

*Id.* at 1541-42. Thus, the Court found the pertinent inquiry to be whether or not the plaintiff had a legitimate claim of entitlement to access and to collect the information. *Id.* In other words, the court looked at whether a journalist can be denied entrance by state action to what he deems as "photo opportunities" of public interest. *Id.* at 1542.

Even though the plaintiff in *D'Amario* was a photographer and not a member of the news media (like Plaintiffs in this case), the court still applied Supreme Court precedent regarding the

---

[1] The district court in *D'Amario* was affirmed without opinion in *D'Amario v. Providence Civic Center Auth.*, 815 F.2d 692 (1st Cir. 1987) and certiorari was denied. 484 U.S. 859 (1987).

6

news media to his case. It acknowledged that there is some protection to insure that the media can seek out the news. *Id.* (citing *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972)). However, it also recognized that the protections afforded to the press were "neither absolute nor as far ranging as freedom of speech itself." *Id.* (quoting *Zemel v. Rusk*, 381 U.S. 1, 17 (1965)). The court narrowed in on *Branzburg* and its teachings that the First Amendment does not guarantee the news media a constitutional right of access to information that is not available to the general public and noted that "[t]here is a considerable difference between, on the one hand, allowing the media to print (or to broadcast) all of the news it collects and, on the second hand, permitting the media totally unchecked access to forage whenever and wherever it pleases in search of tidbits." *Id.*

The court, however, recognized that while the news media cannot command special access, their right to "ferret out" news cannot be capriciously restricted. *Id.* It noted that if the public is permitted to access an event, there must be a reasonable justification and legitimate basis for any governmental obstruction of media access. *Id.* (citations omitted). Once the door the public is opened, the court noted, any governmental limitations must be rationally related to a permissible end. *Id.* After examining an abundance of Supreme Court precedent, the *D'Amario* court found that

> [a]lthough the press cannot command access wherever, whenever, and however it pleases, neither can the government arbitrarily shroud genuinely newsworthy events in secrecy. Members of the press, to their own behoof and as representatives of the public, have some (limited) claim to access *when the government attempts selectively to delimit the audience* (or when government cooperates in enforcing such restrictions).

*Id.* (citations omitted) (emphasis added). The court went on to apply a rational basis test to the "no camera" rule that prohibited the plaintiff from taking pictures of the performers.

7

In this case, *D'Amario* is instructive because it outlines the general rule that although the press does not have the right to unlimited access to newsworthy information, the government, once it opens the door and allows the public access to that same information, cannot restrict access by the press.  Applying that reasoning here, Plaintiffs had no right of access to the deer culling because that event was not open to the general public.  The fact that Plaintiffs were not physically in the park after hours is of no consequence because the culling was not a public event to be viewed either by a person physically present in the park or through the eyes of a camera lens.  Because the Court does not find that Plaintiffs were engaged in expressive activity by recording the images, it need not delve into a further First Amendment analysis of the type of forum and it need not determine what level of judicial scrutiny would apply to typically expressive activity and the prohibition thereof.

It is well-established that there must be an underlying constitutional violation to support a Section 1983 claim.  *Adams v. City of Auburn Hills*, 336 F.3d 515, 522 (6th Cir. 2003).  Because Plaintiffs have suffered no underlying constitutional violation, their Section 1983 claim against Defendants must fail.

**2.     Plaintiffs' Privacy Protection Act Claim**

The Privacy Protection Act (PPA) makes it unlawful for a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize documentary materials . . . possessed by a person in connection with a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication. . . ."  42 U.S.C. § 2000aa(b).  According to Defendants, Plaintiffs' PPA claim should be dismissed because there was no "search and seizure" of the cameras.  Plaintiffs, on the

8

other hand, argue that there was both an "investigation" and a "seizure" within the meaning of the Act, or at the very least, that there are genuine issues of material fact that preclude a grant of summary judgment on this claim.  The Court disagrees with Plaintiffs.

The plain language of the statute makes it unlawful for a government officer or employee to "search for or seize" documentary materials "in connection with the investigation or prosecution of a criminal offense." *Id.*  Here, Plaintiffs planted the cameras in the various parks and the rangers happened upon them while they were engaged in a deer culling operation. Hence, the rangers did not search for or seize the cameras in connection with the investigation or prosecution of a criminal offense.  Clearly, there was no search for the cameras.  And although the rangers took the cameras down and removed them from the trees, the Court does not find that the cameras were technically seized in the sense that the PPA would apply.  Furthermore, even if the Court deemed the taking of the cameras as a seizure, they were not seized "in connection with" the investigation or prosecution of a criminal offense.  Even though Plaintiffs may have been investigated for trespass, those charges were initiated after the cameras were discovered, i.e. the cameras were not allegedly seized in connection with the investigation for trespass. Accordingly, the PPA does not apply and Plaintiffs' claims under the Act are dismissed.  *See generally* S. Rep. 96-874, 96th Cong. (1980), *reprinted in* 1980 U.S.C.C.A.N 3950 (stating that the PPA "addresses itself to protection against *unannounced searches* of the press and others involved in First Amendment activities") (emphasis added).

**B.     Plaintiffs' State Law Claims**

Having disposed of Plaintiffs' federal claims, the Court declines to exercise its supplemental jurisdiction over Plaintiffs' state-law claims.  "In the usual case in which all

federal claims are eliminated before trial, the balance of the factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state law claims." *Carnegie-Mellon v. Cohill*, 484 U.S. 343, 350 n. 7 (1988).  Moreover, the Sixth Circuit has noted the propriety of the district court's dismissal of state-law claims once it has disposed of the federal claims on summary judgment. *Mallory v. Ohio Univ.*, No. 01-411, 2003 WL 22146132 at *6 (6th Cir. Sept. 11, 2003) ("The usual course is for the district court to dismiss state-law claims without prejudice if all federal claims are disposed of on summary judgment.") (citation omitted).  Accordingly, Plaintiffs' state-law claims are dismissed without prejudice.

## V.  Conclusion

Summary judgment is granted in favor of Defendants on Plaintiffs' federal claims.  The Court does not find that Plaintiffs suffered a violation of their First Amendment rights and it does not find that there was a violation of the PPA.  Because Plaintiffs' federal claims have been dismissed, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims and hereby dismisses those claims as well.


IT IS SO ORDERED.

| June 16, 2006 | *s/John R. Adams* |
|---|---|
| Date | John R. Adams |
|  | U.S. District Judge |